IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SELMA HOUSING DEVELOPMENT CORPORATION, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 04-0449-WS-B |
| | ) | |
| THE SELMA HOUSING AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This matter is before the Court on defendant Selma Housing Authority's Motion for Summary Judgment (doc. 34). The parties have submitted detailed memoranda and numerous exhibits in support of their respective positions, and the Motion is now ripe for disposition.[1]

**I.     Background.**

The parties have a protracted history of regulatory and other dealings relating to low-income housing in Dallas County, Alabama. Although the summary judgment filings largely omit details as to the functions of and relationships between the parties, the pleadings reflect that defendant Selma Housing Authority ("SHA") is a public regulatory authority based in Selma, Alabama and formed pursuant to Alabama's Housing Authorities Law, Ala. Code §§ 24-1-20, *et seq.* (Answer (doc. 10), ¶¶ 2, 5.) SHA's functions include, *inter alia*, administering programs of the United States Department of Housing and Urban Development ("HUD"), including the Section 8 publicly assisted housing program, in and near Selma. (*Id.*) Plaintiff Selma Housing Development Corporation ("SHDC") is a private corporation that owns and manages properties participating in HUD's Section 8 program, and

---

[1]      Plaintiff's opposition brief repeatedly references "Defendants" in the plural. There being but one defendant identified in the pleadings, the Court assumes that this enigma is simply a typographical error.

under SHA's regulatory authority, in and around Selma.  (*Id.*, ¶ 6; Complaint, ¶ 6.)[2]  SHDC is one of 250 landlords with whom SHA works on the Section 8 program.  (Answer, ¶ 6.)  In addition to their interaction on Section 8 issues, SHA and SHDC were parties to management agreements for one of SHDC's properties throughout much of the 1990s.  Pursuant to that arrangement, SHA provided management services at a housing development owned by SHDC called Minnie B. Anderson Homes ("MBA Homes").  (*Id.*, ¶ 8.)[3]

The present dispute arises from a patchwork of disparate facts including, in part, SHDC's dissatisfaction with SHA's administration of HUD's Section 8 program and with SHA's performance under the management agreement for MBA Homes.  The Complaint alleges three causes of action under 42 U.S.C. § 1983, each proceeding on the theory that SHA violated SHDC's due process rights in administering HUD programs.  First, SHDC asserts that SHA improperly reduced rents at MBA Homes by failing to follow legally adequate procedures in rent reasonableness determinations.  Plaintiff has now acknowledged the legal infirmities in that cause of action, and has assented to its dismissal.[4] Second, SHDC alleges that SHA wrongfully canceled so-called HAP Contracts, housing assistance payment contracts through which a public housing authority remits payment to the property owner for the difference between the Section 8 tenant's rent contributions and the agreed-upon contract rent. SHDC contends that SHA canceled these contracts without following legally adequate procedures,

---

[2]        The degree of cross-pollination between the two entities is substantial.  Indeed, SHDC's Executive Director, Steve Smitherman, was a member of SHA's Board of Directors in the late 1980s. (Smitherman Dep., at 243.)  Additionally, plaintiff states (without citation to the record) that SHA appointed SHDC's board of directors until 1992.  (Opposition Brief (doc. 42), at 1.)

[3]        As further confirmation of the interconnectedness of these entities, the pleadings reflect that MBA Homes was conveyed by SHA to SHDC in November 1987, a little over three years before the parties entered into their first management agreement for that property.  (Answer, ¶¶ 7-8.)

[4]        In response to defendant's assertion in its Motion for Summary Judgment that this cause of action is untimely, plaintiff wisely concedes that this claim is barred by the applicable limitations period and is due to be dismissed.  (Opposition Brief, at 10.)  Accordingly, the Motion is **granted** as to Count I, and plaintiff's § 1983 due process claim premised on rent reasonableness determinations is **dismissed**.

specifically notice and an opportunity to be heard, and requests injunctive relief to stop SHA from canceling HAP Contracts and to compel SHA to renew them.  Third, SHDC claims that SHA wrongfully increased utility allowances without following legally adequate procedures and in violation of HUD regulations.  According to the Complaint, the practical effect of increased utility allowances is a reduction in rent revenue at SHDC's Woodrow properties.  On that basis, plaintiff seeks an injunction forcing SHA to restore utility allowances to previous levels, as well as money damages for lost rental income resulting from the improper increase in utility allowances.

In addition to these Section 1983 claims, the Complaint also enumerates two state-law causes of action, sounding in breach of contract and fraud, respectively.  The contract claim alleges that SHA breached the management agreement relating to MBA Homes by allowing the property to fall into disrepair, failing to provide adequate security, and prematurely terminating the contract.  In this cause of action, plaintiff claims money damages for resources it expended repairing the property, loss of reputation attendant to SHA's breach, and lost revenue.  Meanwhile, the fraud claim alleges that SHA fraudulently represented that if SHDC constructed new units of Section 8 housing, SHA would grant those units so-called project-based Section 8 status, meaning that the Section 8 voucher would travel with the property rather than with the tenant.  According to the Complaint, SHA had no intention of granting project-based Section 8 status to SHDC's new development, but simply wished to induce SHDC to construct new housing units.  SHDC requests compensatory and punitive damages on its fraud cause of action.

SHA has now filed a Motion for Summary Judgment seeking judgment in its favor as a matter of law on each of the four remaining causes of action.  Because each claim turns on numerous discrete events, with no common body of unifying facts, the Court will refrain from presenting a detailed composite narrative of all pertinent facts distilled from the record.  Instead, the Court will defer recitation of facts until the analysis for each cause of action, at which time the  corresponding disaggregated facts relevant to that particular claim will be set forth.

## II.      Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking

summary judgment bears "the initial burden to show the district court, by reference to materials on file,

that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats &*

*Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its

responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material

fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case

with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."

*Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing

whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and

making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is

to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-*

*Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).   However, the

mere existence of any factual dispute will not automatically necessitate denial of a motion for summary

judgment; rather, only factual disputes that are material preclude entry of summary judgment.  *Lofton v.*

*Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

**III.    Section 1983 Claim Relating to Non-Renewal of HAP Contracts.**

**A.    Pertinent Facts.**[5]

**1.    Termination of MBA Homes HAP Contract.**

SHA inspects local Section 8 properties once each year to monitor the conditions and

maintenance of Housing Quality Standards ("HQS"), which are mandated by HUD.  (Pugh Dep., at

24.)  The annual inspection interval is mandated by HUD regulations.  *See* 24 C.F.R. § 983.204(c).

Any deficiencies causing a unit to fall short of HQS must be corrected by the owner, irrespective of

---

[5]      The Court is mindful of its obligation under Rule 56 to construe the record, including all
evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Lofton*, 358
F.3d at 809; *Johnson v. Governor of State of Fla.*, 353 F.3d 1287, 1292 (11th Cir. 2003) (on
summary judgment, "the district court must view all evidence in the light most favorable to the
non-moving party and resolve all reasonable doubts about the facts in its favor").  Thus, plaintiff's
evidence is taken as true and all justifiable inferences are drawn in its favor.

their source.  (Pugh Dep., at 30-31.)  Under HUD regulations, failure to maintain units in accordance with HQS is grounds for "termination, suspension or reduction of housing assistance payments and termination of the HAP contract."  24 C.F.R. § 982.404(a)(2).

In 2002, SHDC complained to federal officials that SHA inspectors were treating it unfairly in annual inspections.  (Peake Dep., at 142-43.)  Based on these complaints, HUD initiated a "management review" of SHA and its handling of SHDC Section 8 properties in Selma.  In connection with that review, a HUD employee named Greg Price inspected the MBA Homes units in June 2002.  (Price Dep., at 18-19 & Exh. 1.)  At that time, Price observed multiple problems, including damaged vacant units whose windows were broken out and whose doors had been left open, inadequate refuse disposal facilities, debris and old appliances behind the office, peeling paint, rotting wood, damaged meter boxes, missing screens / inadequate ventilation, and the like.  (*Id.* at 33-34 & Exh. 1.)[6]  HUD's ensuing report deemed the MBA Homes units "for the most part in deplorable condition."  (*Id.* at Exh. 1.)  At a return visit to MBA Homes in August 2002, Price observed that certain deficiencies had been corrected, but that the property continued to suffer from unsecured vacant units, missing screens, poor groundskeeping, and the like.  (*Id.* at 38-40.)  SHA inspectors later made the determination that MBA Homes still failed to satisfy HQS.  (*Id.* at 82.)[7]

There was considerable communication (via correspondence, face-to-face meetings, etc.)

_____

[6]      In a contemporaneous review of two other SHDC Section 8 properties, Woodrow and Deer Ridge, Price and HUD did not observe any such problems.  (*Id.* at 35.)

[7]      SHDC maintains that Price "did not come to the conclusion that the units failed Housing Quality Standards" during his June 2002 inspection.  (Opposition Brief, at 4.)  However, the pages of Price's deposition transcript that SHDC cites do not support this proposition; to the contrary, they list an array of deficiencies that Price observed during the June 2002 inspection.  Moreover, the HUD report of July 2002 specifically found that all 6 MBA Homes units inspected in June failed HQS standards and were "in deplorable condition."  (Price Dep., at Exh. 1.)  The Court perceives no record basis for SHDC's contention that there was no finding by HUD or Price in June 2002 that units at MBA Homes failed HQS.  At most, the record shows that Price made no determination in August 2002 that any specific units failed HQS because he did not personally enter any units at that time.  (Price Dep., at 40.)  However, Price and HUD clearly found in June 2002 that numerous units at MBA Homes failed those quality standards, and SHDC's contention otherwise is contradicted by the plain record.

among SHA, SHDC and HUD in the summer of 2002 relating to HUD's inspection of MBA Homes. (Price Dep., at 44, 46; Defendant's Exhs. 10-16.)  During those discussions, Price informed SHA that if SHDC failed to correct the HQS deficiencies at MBA Homes, then SHA could terminate the HAP Contract with SHDC.  (*Id.* at 88.)  SHA sent a series of letters to SHDC advising it of the HQS deficiencies and the consequences of failure to correct same, to-wit: abatement and/or termination of rental assistance on the affected units.  (Defendant's Exhs. 10, 13.)  In August 2002, SHA granted SHDC a 30-day extension to complete repairs and bring MBA Homes into compliance with HQS. (Defendant's Exh. 13.)

On September 24, 2002, SHA notified SHDC that it had conducted a follow-up inspection at MBA Homes on September 19, 2002.  Observing that "it is unfortunate that all findings were not corrected, i.e., peeling paint, rotted wood, missing windows and missing screens," SHA advised SHDC that it "will no longer accept any request for tenancy approvals from MBA Homes," thereby ending all HAP Contracts at that property.  (Defendant's Exh. 16.)[8]

### 2.   Nonrenewal of Other HAP Contracts.

In the wake of SHA's termination of HAP Contracts at MBA Homes in September 2002, SHDC still had HAP Contracts for its Woodrow, Woodrow Ltd. and Deer Ridge Ltd. properties (collectively, "Woodrow and Deer Ridge").  On numerous occasions prior to May 2004, SHA advised SHDC that one or more of SHDC's properties subject to HAP Contracts (including Woodrow and Deer Ridge, as well as MBA Homes prior to the termination of that relationship) were noncompliant with HUD regulations.  (Peake Aff., ¶ 5.)  Among the litany of HUD violations identified by SHA were failure to meet HQS, accepting rents on units no longer occupied by Section 8 tenants, improperly changing rental rates, effectively returning housing assistance monies to tenants instead of to HUD, accepting side payments for garbage collection, and failing to make required repairs.  (*Id.*; Peake Dep.

---

[8]      In this lawsuit, SHDC has not asserted causes of action based directly on the termination of HAP Contracts at MBA Homes.  Nonetheless, these facts are relevant.  The circumstances culminating in the MBA Homes contract termination bear on SHA's stated reasons for nonrenewal of SHDC's other HAP Contracts, and those other HAP Contracts are the focal point of Count II of the Complaint.

at 121-22.)  The record reflects that SHA notified SDHC in writing of these purported violations

several times between June 2002 and May 2004, and that in a number of instances SHA warned

SDHC that failure to correct them could lead to termination of all HAP Contracts.[9]  SHDC denies that

many of these violations occurred.

The situation reached a flashpoint in spring 2004.  On May 18, 2004, SHA learned that SHDC

had sent letters to its Section 8 tenants advising them of rent reductions to take effect on May 14, 2004.

On May 19, 2004, SHA sent a letter to SHDC indicating that this course of action was improper

because (a) SHDC had failed to send SHA a required 60-day notice for reductions in rents; and (b)

SHDC had not sent SHA required written, signed lease agreements showing that tenants had agreed to

the change.[10]  The letter further advised SHDC that it was a violation of the HAP Contract to decrease

the rent amount established by SHA as the tenant portion.  (Plaintiff's Exh. L.)  According to the letter,

such violation could result in loss of Section 8 contracts and oblige SHDC to reimburse SHA for lost

rental funds.  (*Id.*)  It does not appear that SHDC responded to this letter.

On May 20, 2004, just one day later, SHA sent a letter to SHDC stating, in pertinent part, as

follows:

> "The Selma Housing Authority has made the decision to terminate the
> HAP contract with S.H.D.C. on the grounds that S.H.D.C. has never
> made an attempt to follow any regulations as mandated by HUD.

---

[9]      For example, a July 17, 2002 letter from SHA to SHDC objected that SHDC was
charging higher rent to Section 8 tenants than to open-market tenants, in violation of HUD regulations.
SHA cautioned that failure to correct that practice "will result in termination of <u>ALL</u> HAP contracts to
SHDC."  (SHDC Dep., at Exh. 23.)  A SHA letter on the same date stated that SHDC was charging
side payments for garbage collection, in violation of HUD regulations, and that if this error were not
rectified "your HAP contracts will be terminated immediately."  (*Id.* at Exh. 24.)  A September 26,
2003 letter from SHA's counsel indicated that SHDC was charging rent incorrectly, and that "failure to
follow HUD regulations may result in termination of HAP contracts."  (*Id.* at Exh. 26.)

[10]     Price, the HUD representative, testified that he had informed SHA and SHDC that any
change in the rent required 60 days' notice as well as a new lease or lease addendum.  (Price Dep., at
159-60.)  According to SHDC, Price also testified that SHA did not have to approve the rent change
(Opposition Brief, at 8-9); however, once again, the cited portions of the record do not support that
construction of the evidence.

-7-

> S.H.D.C. has continuously shown a total disregard for both HUD
> regulations and S.H.A policy."

(Plaintiff's Exh. F.)[11]  The letter proceeded to denounce SHDC for allegedly continuously threatening

lawsuits and for impairing SHA's ability to perform its designated functions by forcing it "to spend a

great portion of its' [sic] resources dealing with one unreasonable owner."  (Id.)  The letter also

explained that the move-out of Section 8 tenants would not be immediate, but would be achieved

gradually over the course of a year or longer, inasmuch as each Section 8 tenant would be issued a

moving voucher and given 90-120 days to find a new place to live after his current one-year lease term

expired.  (Id.)[12]  The letter specifically mentioned the rent reduction issue, pointing out that "S.H.A. was

never notified by S.H.D.C. of its' [sic] intent to change the rent as required by regulation 24 C.F.R.

982.308."  (Id.)  SHDC apparently does not dispute SHA's assertion that (a) SHDC was required to

give SHA 60 days' notice of the proposed change in rent, and (b) SHDC failed to comply with that

requirement.

Approximately six weeks after SHA announced its decision to nonrenew all HAP Contracts

with SHDC at the Woodrow and Deer Ridge properties, effective on their respective expiration dates,

SHDC initiated this lawsuit.

### B.    Analysis.

Count II asserts a claim pursuant to 42 U.S.C. § 1983, claiming that SHA violated SHDC's

---

[11]    A footnote in the middle of this passage states as follows: "**This is one of the main grounds.  The grounds are numerous and are not limited to the above mentioned**".  (Id.)  Elsewhere, the letter reiterates this theme by indicating that the decision to remove SHDC from the Section 8 program "is not made due to (any) one particular violation.  Rather, it is due to a multitude of events of which HUD is aware."  (Id.)  According to the letter, SHA had concluded that "[u]ndoubtedly, S.H.D.C. does not intend ever to comply with any of the rules, regulations, or policies."  (Id.)

[12]    SHA's Assistant Executive Director, Jacqueline Peake, echoed the May 20 letter in explaining the reasons for terminating SHDC's HAP Contracts.  Peake testified that SHDC had, "over the years, violated the HUD rules, the HUD regs, and HAP contracts repeatedly" and that SHDC "certainly were not qualified to manage a Section 8 program."  (Peake Dep., at 122-23.)  Likewise, in an affidavit Peake explained that the non-renewal decision was made "because SHDC, as the owner of the various properties, demonstrated that it was not qualified to manage a Section 8 program."  (Peake Aff., ¶ 5.)

due process rights by failing to follow "legally adequate procedures" before depriving SHDC of property to which it is legally entitled, "in the form of valid Section 8 rents." (Complaint, ¶¶ 39, 40.) The Complaint elaborates that this claim is predicated on SHA's alleged failure to give SHDC "notice or opportunity to be heard regarding any possible violations of HUD regulations." (*Id.*, ¶ 40.) It is evident from plaintiff's filings that SHDC is claiming a protectable property right to HAP Contracts and/or the renewal of same.

Under Eleventh Circuit precedent, "a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). In this case, defendant maintains that it is entitled to summary judgment on Count II because neither the first nor the third elements are satisfied. As to the former, SHA argues, SHDC had no constitutionally protected property right to renewal of HAP Contracts at Woodrow and Deer Ridge. As to the latter, defendant asserts, even if such a property right did exist, the undisputed facts are that SHDC received both notice and an opportunity to be heard regarding non-renewal of those HAP Contracts before they expired.

### 1.   *Is There a Protectable Property Interest?*

The threshold inquiry in any § 1983 claim alleging a due process violation is whether the plaintiff even has a constitutionally protected interest. *See Economic Development Corp. of Dade County, Inc. v. Stierheim*, 782 F.2d 952, 954-55 (11th Cir. 1986) ("In assessing a claim based on an alleged denial of procedural due process a court must first decide whether the complaining party has been deprived of a constitutionally protected liberty or property interest. Absent such a deprivation, there can be no denial of due process."). In conducting this inquiry, the Court proceeds in recognition of the principle that protected property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Silva v. Bieluch*, 351 F.3d 1045, 1047 (11th Cir. 2003) (citations omitted); *see also Mackenzie v. City of Rockledge*, 920 F.2d 1554, 1559 (11th Cir. 1991) ("State law defines the parameters of a plaintiff's property interest for section 1983 purposes.").

-9-

The mere existence of HAP Contracts between SHDC and SHA, without more, cannot confer a protectable property interest upon SHDC.  Indeed, it is well settled that "[t]he existence of an enforceable contract with a state or local government entity does not give rise to a constitutionally protected property interest."  *Key West Harbour Development Corp. v. City of Key West, Fla.*, 987 F.2d 723, 727 (11th Cir. 1993); *see also Circa Ltd. v. City of Miami*, 79 F.3d 1057, 1062 (11th Cir. 1996) ("We believe that a due process theory is questionable if it is simply used to plug a gap in a potential contract claim by recourse to the Constitution.").  Nonetheless, SHDC asserts that it does have a property interest in not having the HAP Contracts nonrenewed without notice and an opportunity to be heard.

In an unpublished decision, the Tenth Circuit has rejected the notion that a party may have a protected property interest in HAP contracts that a public authority simply elects not to renew.  In *Roscoe v. City of Albuquerque*, 1994 WL 170762 (10th Cir. May 5, 1994), the court affirmed the lower court's reasoning as follows:

> "Plaintiffs did not have a protected property interest in the HAP contracts. Unlike the cases ... cited by plaintiffs, the city did not alter or destroy any obligations owed plaintiffs under the HAP contracts. The city elected not to renew the contracts when they expired or enter into new contracts with plaintiffs, which was the city's right. Plaintiff had no vested interest to renew all of the HAP contracts."

*Id.* at *2.  Moreover, although decided in a slightly different context, the Eleventh Circuit's decision in *Stierheim*, 782 F.2d at 954-55, is instructive in ascertaining when a property right exists in a contract setting.  In *Stierheim*, a development corporation brought a due process claim based on a county's termination of a contract under which the development corporation had administered a HUD grant program.  Ruling that the development corporation had no property interest in the contract, as a matter of law, the *Stierheim* court explained that "[t]he hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause'."  *Id.* at 954 (citations omitted).  Because the terms of the contract provided that it could be terminated at the convenience of either party, the court reasoned, the plaintiff lacked entitlement to continued existence of that contractual relationship and was thereby precluded from acquiring a property interest in its contract with the county.  *Id.*; *see also Key West*, 987 F.2d at 728-30 (development corporation lacked property

-10-

interest in performing redevelopment where municipality had broad discretion to choose development plan and where contracts with development corporation provided that corporation would acquire no right to develop property in any specific manner); *see generally Greenbrier Village, L.L.C. v. Mountain Brook, City*, 345 F.3d 1258, 1266 (11th Cir. 2003) (indicating that determining factor for property right inquiry may be whether public authority possesses discretion to withhold entitlement); *Peden v. Suwannee County School Bd.*, 837 F. Supp. 1188, 1193 (M.D. Fla. 1993) (noting that plaintiff has no protected property right in renewal of employment contract where employer possesses discretion in whether or not to renew it).

In this case, SHDC does not identify any provision of contract, federal law or state law that would in any way limit SHA's discretion in determining whether or not to renew the HAP Contrcts.[13] SHDC does not argue that the *Roscoe* case is contrary to the law of the Eleventh Circuit, nor does it identify any authority standing for the proposition that a property owner has a vested interest in renewal of HAP Contracts when they expire. Plaintiff also fails to identify any respect in which SHA's decision not to renew the HAP Contracts was either contrary to the laws of the state of Alabama or inconsistent with SHA's duties and obligations under the HAP Contracts. Thus, as a general proposition, neither the HAP Contracts nor SHA's decision not to renew same implicates any vested property rights of SHDC.

### 2.    *Can Plaintiff Show a Property Interest by Estoppel?*

Nonetheless, plaintiff insists that it does have a protectable property interest here because *Roscoe* and the authorities recited by SHA are distinguishable. In particular, SHDC explains that in constructing Woodrow in the mid-1990s, it obtained financing through so-called HOME funds provided by HUD. (Smitherman Aff., ¶ 3.) One condition of SHDC's use of HOME funds was that a certain percentage of Woodrow's residents must have income below the mean income for Dallas County, Alabama. (*Id.*) According to plaintiff's Executive Director, Steve Smitherman, SHDC used

---

[13]    To the contrary, the HUD regulation governing disapproval of owners for Section 8 tenancy provides that such decisions are to be made in the administrative discretion of the public housing authority and that nothing in such rule "is intended to give any owner any right to participate in the program." 24 C.F.R. § 982.306(e).

HOME funds for Woodrow "due largely in part to the representation by the Selma Housing Authority that Section 8 assistance would be available for the Woodrow Properties." (*Id.*, ¶ 4.) The nonrenewal of the HAP Contracts, says Smitherman, renders it impossible for SHDC to comply with the tenant income requirement for HOME funds,[14] which in turn means that HUD will immediately call those loans and strip SHDC retroactively of tax credits received through the HOME program. (*Id.*, ¶¶ 5-6.)

Based on these facts, plaintiff argues that it has a protectable property interest in continuation of the HAP Contracts at Woodrow because SHDC relied on SHA's representations about the availability of Section 8 assistance. Although SHDC's brief never uses the term, this argument essentially is one of estoppel.[15] The Eleventh Circuit appears to have recognized the existence of constitutionally protected property rights created by estoppel in certain circumstances under Alabama law. *See Greenbriar Village*, 345 F.3d at 1265; *see generally Villas of Lake Jackson, Ltd. v. Leon County*, 796 F.Supp. 1477, 1488-89 (N.D. Fla.1992) (recognizing a protected property interest under Florida law when a landowner makes a substantial change in position or incurs extensive obligations and expenses in good faith reliance upon a governmental omission or action).[16] In any event, SHA has not disputed that

---

[14]   This is because tenants with below-average incomes cannot afford to live at Woodrow without rent subsidies. (*Id.*, ¶ 5.) Nonrenewal of the HAP Contracts for Woodrow means that its Section 8 tenants will no longer receive such subsidies, and may force them to leave. According to Smitherman, this is exactly what has happened, as 60 Section 8 tenants at Woodrow have moved out since the May 2004 nonrenewal decision, leaving just 10 remaining Section 8 tenants out of 118 units at Woodrow as of June 30, 2005. (*Id.*, ¶ 7; Smitherman Dep., at 66.)

[15]   In considering this estoppel contention, the Court expressly rejects SHDC's argument that its property right was strengthened because SHDC did not engage in any violations sufficiently severe to warrant termination of the HAP Contracts. (Plaintiff's Brief, at 13, 15.) Whether plaintiff engaged in conduct warranting the termination of the contracts is an entirely distinct matter from the threshold legal issue of whether it possessed a property right in renewal of those contracts in the first place. The Court cannot adopt plaintiff's unsupported reasoning that its claim to a protectable property interest is bolstered because it did not do anything to justify deprivation of that property interest.

[16]   That said, at least one appellate court has cast doubt on the viability of a property right by estoppel theory. *See Gunkel v. City of Emporia, Kan.*, 835 F.2d 1302, 1304 n.7 (10th Cir. 1987) (questioning, without deciding, whether "estoppel alone can create property rights in a plaintiff sufficient to support a section 1983 action"); *see generally Circa*, 79 F.3d at 1063 (declaring that

Alabama law allows property rights by estoppel; as such, the Court will assume that such a form of property right is cognizable in Alabama.

Instead, SHA protests that plaintiff's estoppel argument has not been properly pleaded because the Complaint makes no mention of estoppel and does not plead the source of plaintiff's alleged property right as being representations made by SHA.  (Reply Brief, at 3.)  This contention is unsupported and untenable.  It is true that estoppel is an affirmative defense that generally must be pleaded.  *See Shook & Fletcher Insulation Co. v. Central Rigging & Contracting Corp.*, 684 F.2d 1383, 1386 (11th Cir. 1982) (equitable estoppel is affirmative defense that is waived if not raised in responsive pleading or pretrial order); *see also* Rule 8(c), Fed.R.Civ.P. (requiring party pleading to preceding pleading affirmatively to set forth estoppel and any other matter constituting an avoidance or affirmative defense).  However, SHDC is wielding estoppel as a sword, not a shield.  In other words, SHDC is utilizing estoppel as a legal theory to support the existence of a property right undergirding its Section 1983 cause of action.  Plaintiffs are not required to plead the facts supporting each element of their claims or to delineate in detail the theoretical underpinnings of same in their complaint.  *See Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 964 n.2 (11th Cir. 1997) ("A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests."); *see generally In re Southeast Banking Corp.*, 69 F.3d 1539, 1551 (11th Cir. 1995) ("for better or for worse, the Federal Rules of Civil Procedure do not permit district courts to impose upon plaintiffs the burden to plead with the greatest specificity they can").  Thus, defendant's assertion that plaintiff is barred from arguing a "by-estoppel" property right here because it did not plead estoppel as the theoretical basis for the property right identified in the Complaint is inconsistent with binding precedent, as well as the liberal notice-pleading principles espoused in Rule 8(a), Fed.R.Civ.P.

That said, insuperable problems remain with plaintiff's estoppel theory.  Under Alabama law, the elements of equitable estoppel are as follows: (a) that the person against whom estoppel is asserted

---

contractor did not have protectable property interest arising from city's acceptance of its redevelopment proposal).

communicates something in a misleading way with the intention that it be acted upon; (b) that the person

seeking to assert estoppel reasonably relied on the communication; and (c) that the person relying

would be harmed materially if the other person were now permitted to assume a position inconsistent

with his earlier conduct. *See, e.g., Allen v. Bennett*, 823 So.2d 679, 685 (Ala. 2001).[17]  SHDC's

flimsy showing on summary judgment fails to create genuine issues of material fact on any of these

elements.[18]

　　　　First, as to the requirement that SHA communicate something in a misleading way with the

intention that it be acted upon, SHDC's only evidence is Smitherman's statement that at an unspecified

time, an unspecified representative of SHA stated to an unspecified audience "that Section 8 assistance

would be available for the Woodrow Properties." (Smitherman Aff., ¶ 4.)[19]  The Court has difficulty

---

[17]　　　In applying these criteria to SHDC's claims, the Court proceeds in recognition of
Alabama courts' admonition that "[e]quitable estoppel is to be applied against a governmental entity
only with extreme caution or under exceptional circumstances." *Allen*, 823 So.2d at 685.

[18]　　　SHDC does not identify the type of estoppel on which it relies as the source of its
property right, and either promissory estoppel or equitable estoppel could potentially be the
appropriate vehicle.  Nonetheless, the Court need not unravel this mystery of taxonomy here, inasmuch
as Alabama courts have explained that "the elements of equitable and promissory estoppel are
essentially the same." *Mazer v. Jackson Insurance Agency*, 340 So.2d 770, 772 (Ala. 1976).

[19]　　　From reviewing SHDC's opposition brief, the Court cannot discern whether the
representations cited in the Smitherman Affidavit are the same as, or distinct from, an alleged 1993
agreement between SHA and SHDC in which SHA allegedly promised SHDC project-based Section
8 funding if SHDC built more units. (Smitherman Dep., at 65-67.)  Several factors suggest that the two
are distinct.  Plaintiff references the alleged 1993 agreement in the narrative part of his brief, but cites
only the Smitherman Affidavit as support for his estoppel argument.  Moreover, had plaintiff intended to
refer to the 1993 agreement, the Smitherman Affidavit would have been superfluous on summary
judgment because plaintiff could simply have relied on Smitherman's deposition testimony on that point.
Finally, given plaintiff's differing verbiage, the Court cannot assume that the two sets of narratives are
meant to identify one singular set of facts.  Even if plaintiff did intend to rest its estoppel contention on
the alleged 1993 agreement, it could not do so because that agreement had nothing to do with renewal
of HAP Contracts.  An alleged promise to provide project-based Section 8 status (under which
vouchers would remain with a unit rather than with a tenant) cannot rationally serve as a basis for
creating a constitutionally protected property right by estoppel in perpetual renewal of HAP Contracts
which supply only tenant-based, not project-based, Section 8 vouchers.

understanding how such a statement could be deemed misleading.  The facts are that Section 8 assistance was available and was provided at Woodrow for as many as nine years.  SHDC does not allege that SHA informed it that Woodrow would be eligible for Section 8 assistance for perpetuity, or that it understood SHA to be implying as much.  Rather, SHDC's factual proffer is merely that SHA said Section 8 assistance would be available, and that in fact it was available at Woodrow for many years thereafter.  Nor does SHDC point to any evidence that might support an inference that SHA intended that its representation be acted upon.  Given the extraordinarily vague evidence as to what the representation was, the paucity of evidence of the circumstances in which it was made, and the lack of any indication that the statement was even factually incorrect, the Court finds as a matter of law that SHDC has failed to make an adequate showing under the first element of the equitable estoppel standard to reach a jury on its property right by estoppel theory.

Second, SHDC offers no evidence that might allow a finder of fact to conclude that it reasonably relied on the alleged representations.  Leaving aside the "reasonableness" requirement, there is insufficient evidence of reliance at all.  Plaintiff points exclusively to Smitherman's self-contradictory testimony that the decision to use HOME funds "was due largely in part" to SHA's representations. (Smitherman Aff., ¶ 4.)  Was it "largely" or was it "in part"?  Either way, plaintiff points to no evidence and makes no suggestion that SHDC would not have proceeded with HOME financing absent SHA's representation that Section 8 would be available.  Even if plaintiff had proffered such evidence, SHDC has failed to show that its reliance was reasonable.  SHDC knew that HAP Contracts expire at the end of a lease term and that HUD regulations vested SHA with discretion in determining whether or not to renew them.  *See* 24 C.F.R. § 982.306(c) (providing that a public housing authority may deny approval of leases "[i]n its administrative discretion" if, for example, owner violated obligations under a HAP contract or if owner had a "history or practice of non-compliance with the HQS").[20]  Given the clear principles entitling SHA not to renew the HAP Contracts, no reasonable factfinder could determine that

---

[20]     The HAP Contract reinforces this point by providing that it terminates on the last day of the lease and that the public housing authority may terminate the contract for a variety of reasons. (Defendant's Exh. 35.)

SHDC reasonably relied on SHA's vague promise that Section 8 assistance would be available as a guarantee that Woodrow could have Section 8 tenants for all eternity.[21]

Third, SHDC has failed to submit evidence that it would be materially harmed if SHA were allowed to deny renewal of the HAP Contracts despite its earlier alleged promises otherwise. To be sure, nonrenewal of the HAP Contracts means that Woodrow will no longer be able to house Section 8 tenants. Plaintiff has proffered dire prognostications that the loss of Section 8 tenants at Woodrow "virtually ensures that these properties will fall out of compliance with the HOME loans," resulting in "immediate calling of the HOME loans, as well as a retroactive loss of tax credits, resulting in damages well into the millions of dollars." (Opposition Brief, at 11-12.) But there is no evidence that any of these woeful predictions have come to pass. Despite plaintiff's evidence that all or nearly all of the Section 8 tenants have moved out of Woodrow during the last 14 months, there is no showing that plaintiff's HOME loans have been called or that SHDC has retroactively lost tax credits, nor is there evidence that any such catastrophes are imminent. Simply put, there is no evidence that SHDC is in need of a property right by estoppel to forestall an inequitable result.

For all of the foregoing reasons, the Court finds that SHDC has failed to establish any estoppel-

---

[21]      In making this determination, the Court acknowledges that Alabama law provides that "[t]he determination of whether the plaintiff's reliance was justifiable is generally a question of fact for the jury to decide." *Wolff v. Allstate Life Ins. Co.*, 985 F.2d 1524, 1531 (11th Cir. 1993) (applying Alabama law). Despite this standard, it remains incumbent upon plaintiff at the summary judgment stage to present evidence from which a reasonable factfinder could conclude that (a) SHDC relied on the alleged representation of SHA, and (b) SHDC's reliance was reasonable under the circumstances. Plaintiff has failed to meet either of these requirements, but has instead treated the general proposition that reasonableness is usually for the jury as absolving it from any obligation to make any showing as to the reliance element. This interpretation of applicable law is incorrect, as the Court is unaware of any authorities relieving a plaintiff from coming forward with any evidence of reliance, or the reasonableness of same, on summary judgment, simply because that issue is usually for the jury. *See generally Schlange-Schoeningen v. Parrish*, 767 F.2d 788, 794 (11th Cir. 1985) (finding that district court properly submitted reliance issue to the jury where there was sufficient evidence of reliance in the record to warrant doing so); *Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.,* 133 F.3d 1405, 1410 (11th Cir. 1998) (observing that, as a matter of law, plaintiff cannot establish justifiable reliance where representation is controverted by express terms of contract).

based constitutionally protectable property interest in renewal of the HAP Contracts.[22]  In the absence

of any such property interest, its § 1983 claim predicated on alleged due process violations in

connection with nonrenewal of HAP Contracts is due to be dismissed.

> 3. *Assuming a Property Right Exists, Has A Due Process Violation Occurred?*

Even if SHDC could establish the existence of a property right in the renewal of HAP

Contracts, by estoppel or otherwise, defendant maintains that summary judgment remains proper for

Count II because SHDC received all the process that it was due, including both notice and an

opportunity to be heard.

Due process is a "flexible concept that varies with the particular circumstances of each case."

*Grayden*, 345 F.3d at 1232.  It typically entitles an individual to "notice and some form of hearing

before state action may finally deprive him or her of a property interest."  *Cryder v. Oxendine*, 24

F.3d 175, 177 (11th Cir. 1994); *see also Mesa Valderrama v. United States*, --- F.3d ----, 2005

WL 1703094, *6 (11th Cir. July 22, 2005) ("individuals whose property interests are at stake due to

government actions are entitled to notice of the proceedings and an opportunity to be heard"); *United

States v. Land, Winston County*, 163 F.3d 1295, 1298 (11th Cir. 1998) ("Generally, individuals must

---

[22]     Although the Court's analysis proceeds by reference to principles of equitable estoppel,
the same conclusion would obtain in a promissory estoppel analysis.  Under Alabama law, "[a] promise
which the promisor should reasonably expect to induce action or forbearance of a definite and
substantial character on the part of the promisee and which does induce such action and forbearance is
binding if injustice can be avoided only by enforcement of the promise."  *Davis v. University of
Montevallo*, 638 So.2d 754, 757 (Ala. 1994).  For the reasons already stated, the Court is of the
opinion that these circumstances are not ones in which injustice can be avoided only by enforcement of
SHA's alleged representations regarding Section 8 availability.  Besides, "in order for a promise to
create an estoppel, the promise must be sufficiently specific so that the judiciary can understand the
obligation assumed and enforce the promise according to its terms."  *Wyatt v. BellSouth, Inc.*, 176
F.R.D. 627, 631 (M.D. Ala. 1998).  The vague, indeterminate promise that Section 8 assistance
"would be available," without more, is not sufficiently specific to warrant judicial imposition of a
perpetual obligation on SHA to allow Section 8 tenants at Woodrow.  Thus, analysis of SHDC's
property right by estoppel argument through the lens of promissory estoppel would not change the
outcome.

receive notice and an opportunity to be heard before the government deprives them of property.").[23]
The opportunity to be heard must be furnished "at a meaningful time and in a meaningful place."
*Cryder*, 24 F.3d at 177 (citation omitted).

SHDC does not and cannot argue that it did not receive adequate notice of the nonrenewal of
the HAP Contracts. After all, the May 20, 2004 letter from SHA clearly and unequivocally notified
SHDC of that decision. (Plaintiff's Exh. F.)[24] Thus, the sole remaining battleground is whether SHA
afforded SHDC an opportunity to be heard at a meaningful time and place regarding the nonrenewal
decision. SHDC insists that it had no opportunity to be heard because SHA's May 19, 2004 letter
advised it that HAP Contracts would be terminated unless SHDC corrected its methodology for
changing rents, while the letter terminating those contracts was sent the very next day. (Opposition
Brief, at 15.) Given this timing, SHDC maintains, it had no chance to respond to SHA's concerns and
no opportunity to be heard.

The May 20 letter makes clear that SHA was <u>not</u> terminating HAP Contracts in mid-stream;
rather, it explains that as each Section 8 tenant's annual recertification occurs (*i.e.*, at the expiration of
each HAP Contract for each tenant), SHA would issue the tenant a voucher to move. (*Id.*) Thus, the
practical effect of the SHA decision was not an immediate exodus of Section 8 tenants from Woodrow

---

[23]     To assess the requirements of due process in particular cases, courts apply the
balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See
Grayden*, 345 F.3d at 1233 (explaining that *Mathews* factors include private interest at issue, risk of
erroneous deprivation of such interest through procedures used, probable value of additional or
substitute procedural safeguards, and government's interest, including function involved and
fiscal/administrative burdens). In this case, the only process that SHDC claims to have been owed as
to nonrenewal of HAP Contracts was notice and an opportunity to be heard. (Complaint, ¶ 38.)
Given SHDC's failure to identify any other process that it claims to have been due, the Court need not
explore the *Mathews* criteria to ascertain whether procedural due process would require more than
notice and an opportunity to be heard.

[24]     SHA repeatedly directs the Court to page 280 of Smitherman's deposition testimony,
which it characterizes as containing an admission that SHDC "was given adequate notice of the decision
not to renew the HAPs." (Defendant's Brief, at 30; Reply Brief, at 7.) The Court has scrutinized the
cited page in vain for any such admission. Nonetheless, there is ample uncontroverted evidence in the
record to demonstrate constitutionally adequate notice.

and Deer Ridge.  Instead, there was a slow trickle of departing Section 8 tenants lasting a year or more, as each tenant received a voucher to move only at the time of his specific annual recertification date.  (*Id.*; *see also* Smitherman Dep., at 280; Peake Dep., at 135-36.)[25]  Contrary to plaintiff's counsel's suggestion, the effect of the May 20 letter was not immediate termination of existing HAP Contracts, but was simply nonrenewal of each as of their tenant-specific renewal dates.  (Smitherman Dep., at 280.)  So gradual was the implementation of the SHA decision that as of December 31, 2004, more than half of Woodrow's Section 8 tenants were still living there, even seven months after the decision was announced.  (*Id.*)

This timing is significant because it establishes that the SHA decision was not implemented overnight and that there was ample time for SHDC to object or request a hearing before the overwhelming majority of the HAP Contracts came up for renewal.  In other words, had SHDC wished to pursue the matter, it could have responded to the May 20 letter and sought review of the decision before any meaningful number of HAP Contracts were nonrenewed.  SHDC's position is apparently that it should have had an opportunity to be heard on the May 19 letter before the May 20 letter was issued.  But the law of due process has no ironclad requirement of a pre-termination hearing.  Rather, the only requirement is that an opportunity for hearing be furnished "at a meaningful time and in a meaningful place."  *Cryder*, 24 F.3d at 177.  Plaintiff has not shown, and the Court cannot find, that the only "meaningful time" for hearing in this case would have predated the May 20 letter.  The May 20 letter did not alter the status quo immediately, and a hearing in the weeks or months thereafter certainly would have been "meaningful" in the constitutional sense.[26]

---

[25]     Defendant's reply brief directs the Court to page 121 of the Peake Deposition for evidentiary support for this proposition.  (Reply Brief, at 7.)  The cited page is irrelevant to this point, and the proper cite should have been to pages 135 and 136 of that deposition.  Defense counsel is encouraged to double-check record citations for accuracy before submitting them.

[26]     Plaintiff's theory that the May 19 and May 20 letters produced a due process violation is flawed for another reason too.  It is well established that "the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise."  *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994).  Thus, even if some procedural deprivation

Significantly, the May 20 letter invited SHDC to be heard on this SHA decision.  That letter explained that "documentation to support this decision is located in the office of S.H.A., and is available for your review."  (Plaintiff's Exh. F.)  That letter further indicated that "S.H.A. feels it is best to meet with you for an 'on site' review of the files.  You may call this office for an appointment."  (*Id.*)  Finally, in closing, SHA's Executive Director Johnny Moss Sr. provided his telephone number and encouraged SHDC to call him if it had any questions.  (*Id.*)  Reading these statements together, their import is clear.  By making the files underlying its decision available to SHDC for review, expressing a desire to meet with SHDC, and inviting SHDC to call, SHA was affording SHDC an opportunity to be heard.  Yet the undisputed evidence is that SHDC elected to forego that opportunity by failing to contact SHA in any manner other than to serve them with a Summons and Complaint, Count II of which asserts that they were never given an opportunity to be heard.  (Peake Aff., ¶ 6.)  Plaintiff has failed to make any showing, or even to offer any argument, that the opportunity to be heard as described in the May 20 letter was inadequate or that other opportunities to be heard were not available to SHDC.  Absent any such showing, SHDC cannot proceed on a procedural due process claim, as a matter of law.  *See Cotton v. Jackson*, 216 F.3d 1328, 1331 n.2 (11th Cir. 2000) (explaining that "procedural due process violations do not even exist unless no adequate state remedies are available").[27]

The uncontroverted evidence in the record confirms that SHDC received notice of SHA's decision not to renew the HAP Contracts prior to implementation of same.  That same evidence establishes that SHA invited SHDC to be heard, and that the resulting opportunity appeared meaningful

---

was effected by the May 20 letter and the absence of any opportunity for SHDC to respond to the May 19 letter, plaintiff has offered neither evidence nor argument that a hearing after the May 20 letter would have been inadequate to remedy such a deprivation. Plaintiff cannot show that SHA refused to furnish it such a post-May 20 hearing or that any such hearing would have been constitutionally wanting. As such, there is no constitutional violation, and Count II cannot withstand Rule 56 scrutiny.

[27]      To be clear, the Court does not hold that the informal procedure outlined in the May 20 letter was constitutionally sufficient to satisfy procedural due process.  The point is that the record unequivocally shows that SHA offered SHDC an opportunity to be heard.  If SHDC believes this process was inadequate or that available state remedies were otherwise insufficient, then it is incumbent on plaintiff to present argument and evidence in support of such a position.  Plaintiff has utterly failed to do so, or even to address in passing the adequacy of the procedures outlined in the May 20 letter.

-20-

because the nonrenewal decision took effect on a gradual, rolling basis spanning more than a year. Despite its obligation to do so, SHDC has come forward with no evidence or argument that the procedures proffered by SHA were constitutionally inadequate, or that state remedies were otherwise insufficient.  In any event, notwithstanding notice and an opportunity to be heard, SHDC rejected SHA's invitation to review its files, meet with SHA, or contact SHA with questions, instead proceeding directly to file a lawsuit claiming no notice and no opportunity to be heard.  Setting aside the wisdom of that decision, the Court finds that the record does not permit a reasonable inference that SHDC was denied procedural due process with regard to SHA's decision not to renew HAP Contracts.

> ### 4.    *Conclusion.*

Based on the foregoing analysis, the Court concludes that plaintiff lacked a constitutionally protected property right to renewal of HAP Contracts, and that estoppel notions are insufficient to beget such a right in the context of this case.  Even if a cognizable property right did exist, the Court finds that plaintiff has failed to show a due process violation, inasmuch as plaintiff received both notice and an opportunity to be heard with respect to the nonrenewal decision.  The Court understands that SHDC disagrees with the nonrenewal decision.  However, its § 1983 claim presented as Count II challenges the adequacy of the procedural safeguards surrounding that decision, not the veracity or fairness of the decision itself.[28]  On this record, the Court finds that the record does not reflect any genuine issues of material fact as to the viability of plaintiff's § 1983 claim arising from the HAP Contract nonrenewal.  As such, defendant's Motion for Summary Judgment is **granted** as to Count II, and that claim is **dismissed**.

## IV.    Section 1983 Claim Relating to Utility Allowances.

Count III of the Complaint alleges a § 1983 claim predicated on an alleged procedural due

---

[28]    A Section 1983 challenge to the fairness or veracity of the nonrenewal decision would sound in substantive due process, not procedural due process.  However, the law of this Circuit is clear that a plaintiff cannot bring a viable substantive due process claim for deprivations of state-created property rights.  *See Greenbriar Village*, 345 F.3d at 1263 ("non-legislative deprivations of state-created rights, which would include land-use rights, cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrarily and irrationally").  Plaintiff has not pursued and cannot pursue such a theory here.

process violation concerning changes in utility allowances.  According to SHDC, the practical effect of increases in utility allowances for certain Section 8 tenants is that the rent payment received by the property owner declines.  Plaintiff maintains that SHA repeatedly raised utility allowances for SHDC properties without following "legally adequate procedures," including failure to conduct "adequate studies of the regional utility rates" and failure to contact "the proper utilities to determine the average utility rates."  (Complaint, ¶ 43.)

A.       *Pertinent Facts.*[29]

Viewed in the light most favorable to plaintiff, the record shows an inverse relationship between utility allowances and rent received by SHDC for Section 8 tenants at the Woodrow property. (Smitherman Dep., at 175-76.)  In HUD parlance, a "utility allowance" is an amount set aside from the monthly rent payment for use by a Section 8 tenant in paying for utilities.  (SHDC Dep., at 184.)  For example, if the rent on a Section 8 property is $300 and the utility allowance is $50, then the net rent amount received by the owner is $250.  (*Id.*)  If the utility allowance increases to $70, then the net rent amount received by the owner falls to $230.  (*Id.* at 185.)  Ordinarily, when the utility allowance is raised, the property owner can implement a corresponding rent increase so that the net rent received by the owner is unchanged.  (Smitherman Dep., at 175-76; Peake Dep., at 109-10.)  Because of SHDC's participation in the HOME program at the Woodrow project, however, it was unable to raise rents to offset increases in utility allowances for that property.  (Smitherman Dep., at 155, 157; Peake Dep., at 109-10.)

SHA was responsible for computing and adjusting utility allowances for SHDC's Section 8 tenants.  (Peake Dep., at 79.)  Under applicable HUD regulations, SHA was required to review those utility allowances on an annual basis.  (*Id.*; *see also* 24 CFR § 982.517(c)(1) ("[a] PHA must review its schedule of utility allowances each year").)  SHA conducted those reviews by making rate inquiries to different utility companies.  (Peake Dep., at 80.)  If those inquiries showed increases of 10% or

---

[29]       In discussing the utility allowance issue, defendant's reply brief reproduces verbatim almost an entire page of narrative from its initial brief.  (*See* Defendant's Brief, at 18-19; Reply Brief, at 8-9.)  The resulting redundancy is unhelpful and unilluminating.  A reply brief should not be used as a platform for cutting and pasting entire sections of the principal brief.

more, SHA would adjust utility allowances.  (*Id.*)

Although the parties have not clearly presented facts in the record revealing specifics of when and by what amount utility allowances for Woodrow changed, a fair reading of the record is that SHA did in fact substantially increase those utility allowances during the 2002 - 2004 time frame.[30]  Indeed, Smitherman testified that "[t]he utility allowance changed five times in 18 months."  (Smitherman Dep., at 155.)  An October 27, 2003 letter from HUD regarding Woodrow references a "120% increase in utility allowance."  (Plaintiff's Exh. G.)  As such, the Court finds ample evidence in the record that SHA

---

[30]     Plaintiff's brief states that "[i]n October of 2002, SHA revised its utility allowances, effectively doubling the utility allowance used at the Woodrow Properties."  (Opposition Brief, at 5.) Elsewhere, plaintiff's counsel laments the "drastic change in utility allowances" and its potential for "financial collapse" of SHDC.  (*Id.*)  Unfortunately, the cited evidence for these propositions lends no support to them, leaving the Court with nothing but counsel's representations.  The unsupported representations of counsel do not constitute evidence that may be considered on summary judgment. *See, e.g., Nieves v. University of Puerto Rico*, 7 F.3d 270, 276 (1st Cir. 1993) ("Factual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment."); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000) ("opinions, allegations, and conclusory statements of counsel do not substitute for evidence"). Therefore, the Court cannot and does not consider plaintiff's counsel's conclusory unsupported representation that SHA doubled the utility allowance at Woodrow in October 2002.  In the argument section (not the factual section) of its brief, SHDC urges the Court to compare two sets of exhibits to see changes in utility allowances at Woodrow in 2002 and 2003.  (Opposition Brief, at 17.)  However, the exhibits (several of which are unverified and unauthenticated) do not allow for easy apples-to-apples comparisons of utility allowances at Woodrow, and require speculation or assumption in computing and comparing same.  (*See* Plaintiff's Exhs. G, H, P, Q.)  The Court cannot engage in such an exercise.

More generally, both sides' briefing unnecessarily complicates matters by failing to specify whatever facts may be in the record regarding utility allowances. When did they increase?  By how much?  Such basic factual information lies at the heart of Count III, yet neither side directs the Court to clear record evidence of same in their summary judgment submissions.  To the extent that such data is buried in the record, it is not incumbent on this Court to scour hundreds of pages of exhibits in search of supporting evidence.  *See, e.g., Witbeck v. Embry Riddle Aeronautical University, Inc.*, 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions regarding whether genuine issues remain for trial.").

-23-

increased the utility allowance at Woodrow during the relevant period.[31]

In 2003, at the recommendation of HUD, SHA hired a consultant named Frank Denny to study utility rates in the Selma area.  (Price Dep., at 132; Peake Dep., at 81.)  Denny proceeded to gather information from the relevant utility companies and perform certain calculations, at the end of which he found an increase in utility rates in that area between 2002 and 2003.  (*Id.*)  SHA then sent Denny's report to HUD, which approved the study and the proposed utility allowances.  (*Id.* at 82.)

An SHA official testified that property owners such as SHDC are given no advance notice of increases to utility allowances, nor are they given an opportunity to object.  (Peake Dep., at 82.)  In its Motion for Summary Judgment and supporting materials, defendant points to no evidence that SHDC was ever given an opportunity to be heard by SHA with regard to the changes in utility allowance.  Nonetheless, the record does show that SHDC lodged complaints to HUD about the SHA utility allowance figures, and that HUD formally reviewed those allowances in response to SHDC's request.[32]

### B.    *Analysis.*

The only basis on which defendant seeks summary judgment on Count III is its contention that SHDC lacks any protectable property right in the schedule of utility rates adopted by SHA.

---

[31]    The record also includes testimony that SHA did not adjust utility allowances between 1992 and 1999 because it was "trying to make sure that the SHDC program was solvent."  (Moss Dep., at 174.)  The propriety of SHA's decision effectively to exempt SHDC from utility allowance increases during that seven-year period is not before the Court at this time.

[32]    Specifically, the record shows that SHDC took up the issue with HUD by complaining that SHA's utility allowances failed to account for energy savings of heat pumps at Woodrow.  (Price Dep., at 133-34.)  Upon review of SHDC's arguments and its supporting evidence (which apparently consisted of a Montgomery Housing Authority chart for utility allowances that featured a separate line item for heat pumps), HUD concluded that SHA's utility allowance was "pretty reasonable."  (*Id.*)  On January 27, 2003, HUD sent a letter to SHDC explaining that at the latter's request HUD had reviewed SHA's utility allowances in comparison to those from Montgomery.  (Defendant's Exh. 29.)  Based on its review, HUD concluded that "Selma's electrical allowances are reasonable in comparison to Montgomery's electrical allowances and no adjustments are warranted."  (*Id.*)  When SHDC apparently continued to press the matter, HUD followed up with a second letter to SHDC dated June 10, 2004, stating, "[o]ur reviews continue to reveal the Selma Housing Authority's (SHA) compliance with HUD requirements in establishing and implementing utility allowances is acceptable."  (Defendant's Exh. 32.)

-24-

(Defendant's Brief, at 30-34.)  Plaintiff counters that constitutionally protectable property rights are implicated here based on the following syllogism: (a) because of the HOME financing for Woodrow, SHDC effectively cannot raise rents there; (b) the utility allowance is set aside from the rent contribution paid to the property owner; and (c) therefore, any increase in utility allowance results in a dollar-for-dollar decrease in rents actually received by SHDC for Section 8 tenants at Woodrow.  Given these record facts, SHDC reasons, "[t]he loss of rental income results in a loss of revenue to the Woodrow Properties, which surely must be considered a loss of a 'property right' for due process purposes." (Opposition Brief, at 16.)

        As a general proposition, SHDC is correct that a property owner's right to collect rent is a property right, abridgment of which may give rise to a § 1983 claim.  *See, e.g., Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1046 (5th Cir. 1998) (finding under Texas law that landlord had constitutionally protected property interest in lost rent).[33]  Nonetheless, it does not follow that any state action that might alter, adjust or otherwise impact a landowner's rent revenue stream necessarily implicates a property right cognizable in a § 1983 action.[34]  To the contrary, it is well settled that a property right generally requires "an individual entitlement grounded in state law, which cannot be removed except 'for cause.'"  *Stierheim*, 782 F.2d at 954 (citations omitted).  Thus, courts examining § 1983 due process claims predicated on impingement of a property owner's right to collect rent must consider the surrounding circumstances, including the reasonableness of the owner's expectations in

---

[33]        That said, plaintiff's reliance on *Amen v. City of Dearborn*, 718 F.2d 789, 797 (6th Cir. 1983), is misplaced.  Although plaintiff states that the *Amen* court found that "deprivation of rental income is an interference with property rights" (Opposition Brief, at 16), the Court has scoured *Amen* in vain for any such holding.  The *Amen* court found an infringement of property rights where a city effectively forced residents to sell their homes by denying or delaying permits, requiring excessive repairs and the like.  That case had nothing to do with rental income or recognition of a constitutionally protected property interest in such rental income.

[34]        To accept plaintiff's strained logic would be to expand drastically the scope of § 1983 litigation by recognizing constitutional interests whenever a government authority takes any action that might reduce one's rental income, no matter how incidental or indirect the effect might be.  The Court does not believe that § 1983 jurisprudence authorizes or permits such an expansive interpretation of the scope of the constitutional right to due process.

receiving rent and the government's discretion (or lack thereof) in adjusting same.  *See, e.g., Carson Harbor Village, Ltd. v. City of Carson*, 86 Fed.Appx. 274, 276 (9th Cir. Jan. 2, 2004) (rejecting property owner's procedural due process claim predicated on denial of proposed rent increase, reasoning that housing authority's discretion in whether to grant or deny rent increase forecloses existence of property right); *Greenbrier Village*, 345 F.3d at 1266 (explaining that public authority's discretion to withhold entitlement is key factor in determining existence of property right).  Plaintiff concedes the importance of these factors by arguing that SHDC's property right derives from its "reasonable expectation that SHDC will receive a certain rental income" from its Section 8 tenants.  (Plaintiff's Brief, at 16.)  At least in part, then, the determination of whether SHDC has a constitutionally protected property interest in receiving "a certain rental income" depends on the reasonableness of its expectation in that regard.

Considered through this prism, the record plainly shows that SHDC lacked a cognizable property interest in receiving a fixed level of rent for each Section 8 tenant.  In entering into lease agreements with Section 8 tenants, SHDC undoubtedly knew that the terms of that relationship were governed by HUD rules and regulations.  One such regulation is 24 C.F.R. § 982.517, which imposes upon SHA the responsibility to "maintain a utility allowance schedule for all tenant-paid utilities."  § 982.517(a)(1).  Moreover, that same regulation obliges SHA to "review its schedule of utility allowances each year," and requires SHA to revise that schedule "if there has been a change of 10 percent or more in the utility rate since the last time the utility allowance schedule was revised."  § 982.517(c)(1).  Nothing in that regulation purports to cabin SHA's discretion in preparing or revising that schedule of utility allowances, either by mandating HUD approval or by creating procedures for property owners to contest the schedule.  *See Johnson v. Housing Authority of Jefferson Parish*, 2004 WL 2414095, *10 (E.D. La. Oct. 28, 2004) ("the standards set forth in 24 C.F.R. § 982.517 regarding how utility schedule allowances are to be determined, are subject to the exercise of wide discretion to the public housing agency").[35]

---

[35]    To be sure, HUD regulations provide that Section 8 tenants have a right to an informal hearing to address whether "[a] determination of the appropriate utility allowance (if any) for

Simply put, SHDC knew from the outset that its Section 8 tenants' utility allowances were subject to adjustment in SHA's discretion and that any increases in Woodrow utility allowances would yield a corresponding decrease in rent received by SHDC under the terms of its HOME financing arrangements. In light of this statutory and regulatory scheme, and SHDC's undisputed knowledge of same, the Court cannot discern -- and SHDC has not identified -- any legitimate source, either in state law or otherwise, of a constitutionally protected property interest on the part of SHDC in collecting rents from its Section 8 tenants at Woodrow free from any adjustment of the utility allowance.

This point is confirmed and reinforced by the fact that SHA's increase in the utility allowance had only an indirect, incidental impact on SHDC's ability to receive rents. The alleged infringement about which SHDC complains was caused by the inflexibility of the HOME financing arrangements to which it agreed and the inherent uncertainty of its rental income caused by such rigidities, not by any changes to the utility allowance. Besides, it is beyond cavil that HUD regulations allow for adjustments in utility allowances to benefit low-income housing recipients, not to safeguard landlords' rights to particular rent amounts. *See generally Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 432, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (holding that the statutory rent-ceiling provision allowing surcharge for excess utility usage creates enforceable rights for tenants under § 1983, because HUD regulations were intended to benefit tenants and set forth specific guidelines that housing authorities must follow in setting utility allowances). The Court therefore cannot accept

---

tenant-paid utilities from the PHA utility allowance schedule" is contrary to law insofar as it relates to the individual circumstances of the tenant. 24 C.F.R. § 982.555(a)(1)(ii). Nothing in the applicable regulations would purport to confer upon the property owner a corresponding right to an informal hearing. Even if it did, SHDC's dissatisfaction is not with the application of an existing utility allowance schedule to compute particular tenants' utility allowance (as to which a tenant would have a right to an informal hearing), but is rather with the creation of the utility allowance schedule itself (as to which a tenant would have no right to informal hearing). *See* 24 C.F.R. § 982.555(b)(3) (providing that tenants have no right to an informal hearing with regard to "[e]stablishment of the PHA schedule of utility allowances for families in the program"). Thus, to the extent that SHDC argues that HUD regulations created an enforceable right to a hearing on adjustments to utility allowances, that contention fails for two respects: (i) the right to hearing attaches only to tenants, not property owners, and (ii) the right to hearing attaches only to application of an existing utility allowance schedule to a particular tenant, not to the terms of that schedule in the first place.

plaintiff's attempt to fashion a constitutionally protected property interest from an adjustment to a utility allowance schedule that, as a matter of HUD regulation, was not designed for plaintiff's benefit at all.

Finally, the Court recognizes that plaintiff has waffled on its theory for Count III. Although most of the Complaint and briefs characterize this cause of action as a procedural due process claim predicated on a violation of due process, other sections reflect ambiguity, as plaintiff strays far from a procedural due process analysis into an apparent argument that violation of HUD regulations itself implicates substantial federal rights that may properly be vindicated under § 1983.[36] It is a correct statement of law that § 1983 relief is not confined to constitutional violations, but may also encompass violations of rights created by federal statutes. *See South Camden Citizens in Action v. New Jersey Department of Environmental Protection*, 274 F.3d 771, 779 (3rd Cir. 2001) ("causes of action under section 1983 are not limited to claims based on constitutional or equal rights violations. Rather, certain rights created under federal statutes are enforceable through section 1983 as well."). However, the Supreme Court has taken pains to explain that "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Gonzaga University v. Doe*, 536 U.S. 273, 286, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). It is inconceivable that SHDC could satisfy such a daunting threshold with respect to HUD regulations concerning utility allowances, which were plainly designed to benefit tenants, not property owners. Certainly, nothing in the text or structure of 24 C.F.R. § 982.517 or the underlying statute can be reasonably read as creating new individual rights for property owners. Apparently recognizing the precariousness of its position, SHDC does not even attempt to develop such an argument.

---

[36] For example, four separate paragraphs of Count III address alleged substantive violations of HUD regulations, rather than procedural defects in the alleged deprivation. (*See* Complaint, ¶¶ 44-47.) Nowhere in Count III does plaintiff object to an alleged denial of notice or an opportunity to be heard, which are the cornerstones of a procedural due process claim. Similarly, plaintiff's brief is rife with references to alleged "real factual disputes regarding the reasonableness of the utility allowance increases at the Woodrow properties." (Opposition Brief, at 16.) If in fact this claim were merely one for procedural due process, it is unclear why any of these substantive deficiencies would matter to the analysis.

More generally, the Court fully agrees with the decision of the Eastern District of Louisiana in an unpublished opinion that "the rights Plaintiffs assert are protected by 42 U.S.C. § 1437f(o)(2) and its implementing regulation, 29 C.F.R. § 982.517, simply defy judicial enforcement." *Johnson*, 2004 WL 2414095, at *10 (reasoning that a HUD regulation of its own accord might not create an enforceable right under § 1983, that the utility-allowance regulation lacks the unambiguous rights-creating text required under *Gonzaga*, that the regulation imbues such wide discretion in the housing authority in setting utility allowances that it would be difficult if not impossible to determine whether a violation had occurred, and that the language of the regulation lacks a method for fixing the utility allowance for particular tenants, thereby precluding meaningful relief in the event of a violation). The Court finds the *Johnson* analysis persuasive in foreclosing any attempt by plaintiff to secure § 1983 relief based on alleged rights created under HUD's utility allowance regulations. On this basis, the undersigned rejects plaintiff's attempt to withstand summary judgment on Count III by arguing that the relevant HUD regulations confer enforceable rights on it for § 1983 purposes.

For the reasons set forth above, it is the opinion of this Court that the record does not permit a reasonable inference that SHDC had a protectable property interest in maintaining utility allowances at a fixed level. This is so even though an indirect result of SHA's increases in utility allowances was that the rents received by SHDC at the Woodrow facility declined because of the financing structure that SHDC used in constructing that project. Because SHA's adjustments to the utility allowances did not infringe upon any constitutionally protected property interest belonging to SHDC, the procedural due process claim set forth in Count III of the Complaint cannot succeed. Alternatively, to the extent that SHDC would have the Court find that the applicable HUD regulations create substantial federal rights enforceable through § 1983, the Court finds this position to be unsupportable and contrary to law. In the absence of a protectable property interest or any other legally sufficient basis for § 1983 relief on the utility allowance issue, SHA is entitled to entry of judgment as a matter of law as to Count III.

## V.    State-Law Claim for Breach of Management Contract.

Having addressed plaintiff's Section 1983 claims, the Court now turns to the state-law causes of action sounding in breach of contract and fraud. As to the former claim, Count IV of the Complaint

alleges that SHA and SHDC entered into a written contract whereby SHA would maintain and manage MBA Homes, which were owned by SHDC.  According to the Complaint, SHA breached this management contract by: (i) failing properly to maintain the property, (ii) failing to provide adequate security or to remove tenants who posed security threats, and (iii) prematurely terminating the contract. (Complaint, ¶¶ 51-53.)  In its Rule 56 Motion, SHA maintains that Count IV is barred on statute of limitations grounds, that SHDC cannot establish breach of contract, and that SHDC cannot show damages resulting from any such breach.

### A.    Pertinent Facts.

Over time, the parties entered into three management contracts relating to MBA Homes, with the earliest being executed in 1991 and the latest running through 1998.  (SHDC Dep., at 14-15; Peake Aff., ¶ 3.)  Although the final written agreement expired by its terms on December 31, 1998, the parties extended it verbally on a month-to-month basis until SHA terminated the agreement effective September 30, 1999.  (Moss Dep., at 187; Peake Aff., ¶ 3 & Exh. A.)  The contract executed on January 1, 1998 (the "1998 Agreement") provides, in part, that SHA will maintain MBA Homes "in a safe, decent and sanitary condition at all times to insure full compliance with Section 8 Housing Quality Standards," and that it will not "demolish property, remove large trees, contract major repair, or purchase equipment" without SHDC's approval.  (Peake Aff., at Exh. A ¶ 7.)  The 1998 Agreement further states that SHDC will pay SHA $331,000 to cover the cost of "non-routine repairs, replacements, security, garbage, taxes, insurance and utilities" for the one-year term of the contract. (Id., ¶ 9.)[37]

SHDC now contends that SHA breached these management contracts in several respects: (a) cutting down large White Oak trees lining the entrance to the property in 1994 without SHDC's permission; (b) improper grounds maintenance, which resulted in overgrowth of an unsightly type of grass; and (c) inadequate security, as manifested by the escalation of crime on the property from 1997-

---

[37]    The one-word reference to "security" in the "Compensation of Agent" section is the lone mention of security in the 1998 Agreement, which in no way delineates or purports to delineate specific security functions or obligations of SHA.

99.  (SHDC Dep., at 15-17.)

SHDC admits that SHA "attempted to provide security" at MBA Homes during the term of the management contracts.  (Opposition Brief, at 19.)  In that regard, SHDC acknowledges that SHA took some action to rid MBA Homes of drugs and illegal tenants, and that it "[p]eriodically" retained security personnel to patrol the premises.  (SHDC Dep., at 301-02.)[38]  SHDC answered affirmatively when asked whether SHA had provided "any security" at MBA Homes during the management contracts.  (SHDC Dep., at 244-45.)  In 1998, for example, SHA spent $22,305 for security at MBA Homes, some $505 more than it had budgeted. (Peake Aff., ¶ 4.)  These funds were devoted to hiring off-duty police officers to patrol the property.  (*Id.*)

Notwithstanding these concessions, SHDC's contention in Count IV is that SHA's security efforts were "inadequate for the size of MBA Homes."  (Opposition Brief, at 19.)[39]  The record reflects that SHDC advised SHA during the management contract terms that "there were some alternative methods that could have been used" to improve safety on the property, but that SHA did not adopt those recommendations.  (SHDC Dep., at 245.)  According to SHDC, after SHDC took control of management of MBA Homes, "most of the crime had dissipated by 2002" because of its implementation of new security techniques and its arrests of more than 20 people on the property between 1999 and 2000.  (SHDC Dep., at 17, 244; Plaintiff's Exh. S.)  SHDC's evidence is that the diminution in crime at MBA Homes began immediately after SHDC took over management there in

---

[38]     SHA maintains that SHDC testified that SHA "had installed cameras" on the site (Defendant's Brief, at 21); however, the cited pages of the record do not support that allegation.  In fact, the relevant testimony was that SHDC (not SHA) had installed cameras at MBA Homes.  (SHDC Dep., at 242, 301-02.)

[39]     According to plaintiff, "[s]o dissatisfied was SHDC with Defendant's services, that SHDC took it upon themselves to provide security during the term of the management contract."  (Plaintiff's Brief, at 19.)  This statement, like defendant's regarding the cameras, misstates the record and is misleading.  In fact, the portion of the record cited by plaintiff includes testimony about various security measures undertaken by SHDC with no mention of time frame, except for a statement that these events occurred "right after taking over.  That's in '99.  I think we carried it through the middle of the next summer."  (SHDC Dep., at 242-45.)  This testimony runs directly contrary to the proposition for which it is cited in plaintiff's brief.

September 1999, and that the abatement of crime took approximately eight months to achieve. (SHDC Dep., at 18.)

SHA gave SHDC thirty days' written notice before terminating the oral management agreement in September 1999.  (Moss Dep., at 187.)

### B.    *Analysis.*

Plaintiff's breach of contract claim fails for two reasons.  First, by SHDC's admission, a number of the alleged breaches occurred more than six years before the lawsuit was filed, such that the resulting contract claims based on such breaches are time-barred.  Second, on the security, grounds maintenance and termination issues, plaintiff has failed to make an adequate showing that SHA was, in fact, in breach of the management contracts.

### 1.    *All Pre-1998 Breaches of Contract Are Untimely.*

Under Alabama law, an action for breach of contract must be brought within six years after it accrues.  *See* Ala. Code § 6-2-34(4), (9); *Jones v. Alfa Mut. Ins. Co.*, 875 So.2d 1189, 1195 (Ala. 2003) ("the period of the statute of limitations for a contract action is six years").  Alabama courts have explained that the right of action for breach of contract generally accrues at "the time of the breach of the agreement rather than the time that actual damages are sustained as a consequence of the breach." *Stephens v. Creel*, 429 So.2d 278, 280 (Ala. 1983) (citation omitted).

SHDC has testified that its breach of contract claim includes dissatisfactions with trees being chopped down in 1994 and improper grounds maintenance prior to 1997.  (SHDC Dep., at 16.)  This lawsuit was filed on July 6, 2004.  Plaintiff has identified no basis for tolling the limitations period, nor does any appear in the record.  As such, to the extent that the breach of contract cause of action hinges on breaches of management contracts prior to July 6, 1998, Count IV is untimely and defendant's Motion for Summary Judgment is **granted**.[40]

---

[40]      In opposition to the untimeliness argument, plaintiff contends that problems with the grounds "persisted for the life of the contract" and that therefore "no cause of action for these violations accrued until the termination of the contract in September of 1999."  (Opposition Brief, at 20.)  Plaintiff does not cite a single authority in support of this untenable (albeit novel) proposition.  Alabama law unambiguously provides that an action for breach of contract accrues, and the statute of limitations

> 2.     *The Record Does Not Support an Inference that SHA Breached the*
> *Agreements as to Security, Grounds Maintenance or Premature*
> *Termination in 1998 and 1999.*

Plaintiff's filings indicate that Count IV encompasses a number of alleged breaches occurring after July 6, 1998, such that at least portions of the claim are timely.  In particular, plaintiff alleges that SHA failed to provide adequate security in 1998 and 1999, that SHA provided improper grounds maintenance until the end of the management agreement, and that SHA prematurely terminated the contract with insufficient notice to plaintiff in September 1999.  Each of these contentions will be weighed in accordance with the elements of a breach of contract claim under Alabama law.  "To establish a breach-of-contract claim, a plaintiff must show (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages."  *Jones*, 875 So.2d at 1195 (citation omitted); *see also Shelton v. Clements*, 834 So.2d 775, 782 (Ala. Civ. App. 2002) (similar).

With regard to security, plaintiff's evidence is that the level of crime at MBA Homes increased from 1997 to 1999, that plaintiff was dissatisfied with the security arrangements made by SHA, and that plaintiff reversed the trend within eight months after regaining management responsibilities in September 1999.  What plaintiff does not do, however, is show how SHA's performance in this regard fell short of its contractual responsibilities.  Stated differently, there is no evidence and there has been no argument that the management agreements established a minimum threshold level of security service that SHA failed to meet.  Plaintiff points to nothing in the agreement or the parties' negotiations relative to same under which SHA promised to provide a particular level of security or to keep crime below a certain level.  At most, the management agreement required that SHA's fee was to cover, among other things, "security."  (Peake Aff., at Exh. A ¶ 9.)  But the undisputed, agreed evidence is that SHA did that,

---

begins running, at the time of the breach.  *See Stephens*, 429 So.2d at 280; *see also AC, Inc. v. Baker*, 622 So.2d 331, 334-35 (Ala. 1993) (declining to apply "continuing contract" doctrine and noting that Alabama Supreme Court has never embraced such a doctrine).  Clearly, then, SHDC's breach of contract claim is time-barred insofar as it attempts to litigate alleged breaches occurring more than six years before the Complaint was filed.  That said, plaintiff can base a breach of contract claim on alleged breaches occurring after July 6, 1998, without contravening the timeliness bar.

spending in excess of $20,000 per year for off-duty police officers to patrol the grounds.  After careful inspection of the written agreement, the Court is unable to discern any promise that SHA failed to keep even if, as plaintiff's evidence shows, SHDC viewed SHA's security services as substandard or ineffectual.  Plaintiff's generic statements that "the level of security provided was not in compliance with the terms of the contract" (Opposition Brief, at 19) are woefully inadequate on summary judgment in the absence of any showing that the terms of the contract required SHA to provide any designated "level of security."  The Court declines to read into the agreement provisions that are not there or to conjure up contractual interpretation arguments that plaintiff has not articulated.  Simply put, there is no evidence from which a reasonable jury could find that SHA breached any provision of the management contracts regarding security.  Rather, the record shows that SHA promised to provide security services, and that it did exactly that throughout the life of the contract.[41]

On the subject of grounds maintenance, the 1998 Agreement obligated SHA to perform such "cleaning, painting, plumbing, carpentry, ground care, and such other maintenance and repair work as may be necessary to maintain Section 8 Housing Quality Standards."  (Peake Aff., at Exh. A ¶ 7.)  SHDC testified that SHA allowed a type of undesirable grass to flourish on the property until it was "too late to eradicate the grass."  (SHDC Dep., at 15; Smitherman Dep., at 95.)   But plaintiff offers no specific evidence that either (a) a different approach to grass maintenance was "necessary to maintain Section 8 Housing Quality Standards," or (b) even if it was, that the timing of any such breach by SHA placed it within the six-year limitations period (*i.e.*, that it postdated July 1998).[42]

---

[41]    Plaintiff's argument that a jury question is presented as to whether the level of security provided was adequate to satisfy the terms of the contract misses the mark.  (Opposition Brief, at 20.) Had plaintiff presented evidence that the agreement imposed any kind of requirement for a particular threshold of security, this contention might be valid.  But it manifestly does not.  Thus, plaintiff's argument skips the crucial analytical step of identifying the contract provision that it contends obliged SHA to provide any particular level of security.

[42]    At most, SHDC offers minimal, vague testimony of some continuing grounds maintenance problems following 1997:

"Q:    Okay.  And the improper grounds maintenance was prior to 1997?
"A:    Correct.

-34-

Perhaps recognizing the difficulty with its improper grounds maintenance argument, plaintiff endeavors to recast the argument on summary judgment by asserting that SHA "failed to keep adequate management on the property," that it "would cannibalize vacant units in order to complete repairs in occupied units," that it "would attempt to classify routine repairs as 'capital improvements'," and that "[s]uch problems persisted for the life of the contract." (Plaintiff's Brief, at 20.) Unfortunately, the only record evidence cited in plaintiff's brief in support of these notions does not support them. As discussed *supra*, the Court cannot accept unsupported representations of counsel as summary judgment evidence. Plaintiff having come forward with no evidence that defendant failed to maintain MBA Homes in accordance with the agreement in any respect other than yard or lawn maintenance, having failed to show how the grass issue violated the agreement, and having come forward with no record evidence that any specific maintenance failings occurred within the six year period preceding the filing of this lawsuit, the Court finds that defendant is entitled to entry of judgment in its favor as a matter of law with respect to the improper grounds maintenance aspect of the contract claim.

Finally, in the Complaint, plaintiff contends that SHDC breached the contract by prematurely terminating it and by providing plaintiff insufficient time to resume management responsibilities for MBA Homes. (Complaint, ¶ 53.) However, this ostensible basis for Count IV is not mentioned in plaintiff's response to the Motion for Summary Judgment. By virtue of plaintiff's omission, this ground for relief is abandoned. Indeed, the Eleventh Circuit has held that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment." *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568

---

"Q:     Okay.  And --
"A:     I mean, I think the whole time."

(SHDC Dep., at 16-17.)  This testimony remains far too imprecise as to time period to alleviate the limitations concerns identified *supra*; furthermore, it never identifies what specific "improper grounds maintenance" violations occurred after July 1998.  Only through supposition, speculation, and haphazard guesswork could one conclude from this sliver of evidence that SHA breached the management contract within Alabama's six-year limitations period.  On this meager showing, the Court can find no reasonable inference of a breach of the management agreements following July 1998 relating to grounds maintenance.

-35-

(11th Cir. 1994); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (party's failure to brief and argue issue before district court is ground for declaring it abandoned); *McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (noting that a claim may be considered abandoned when it is included in the complaint, but plaintiff fails to present argument concerning this claim to the district court).[43]  Such holdings are grounded on the well-worn principle that "the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir. 1997); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 892 (Fed. Cir. 1999) (discussing "unremarkable proposition that assertions made in the pleadings ..., but not made in opposition to a motion for summary judgment, need not be considered by the district court or the appellate court in ruling on the motion").  By foregoing the opportunity to raise the premature termination theory of its breach of contract claim in response to defendant's summary judgment arguments, plaintiff has abandoned that basis for relief.[44]

**VI.   State-Law Claim for Fraud.**

Continuing its kitchen-sink approach, the Complaint raises a fifth cause of action (improperly

---

[43]       Such holdings are not unique to the Eleventh Circuit. *See generally Laborers' Int'l Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions."); *Ali v. Brown*, 998 F. Supp. 917, 924 (N.D. Ill. 1998) (where complaint alleged discrimination on basis of several protected characteristics, but summary judgment brief pursued only Title VII race claim, plaintiff's failure to support remaining claims with legal argument or authority waived them).

[44]       Even if this aspect of Count IV had not been abandoned, summary judgment would remain proper, inasmuch as neither the agreement nor any other record evidence presented by the parties would purport to limit either side's ability to discontinue their management arrangement at will following the December 31, 1998 expiration of the written agreement.  Simply put, plaintiff has not shown that <u>any</u> notice was required under the operative contract.  Thus, there is no evidence that SHA breached any provision of any agreement by furnishing SHDC with "only" 30 days' written notice before terminating the management arrangement in September 1999, fully nine months after expiration of the last written agreement on the subject.

numbered as "Count IV" in the body of the Complaint) for fraud.  According to the Complaint, SHA represented to SHDC that SHA would grant project-based Section 8 status to new public housing units if SHDC would construct them.  (Complaint, ¶ 56.)  SHDC maintains that it built 117 new units in the mid-1990s in reliance on this representation, but that SHA never intended to provide project-based Section 8 status and in fact never did so.  (*Id.*, ¶ 59.)  The Complaint further alleges that "[a]bsent the representation by SHA, SHDC would not have undertaken to build the new units."  (*Id.*)  Defendant now moves for summary judgment on this cause of action on the ground that it is time-barred.

### A.    *Pertinent Facts.*

Smitherman testified that in 1993 there was a "verbal agreement" between SHA and the SHDC regarding project-based Section 8 financing.  (Smitherman Dep., at 60.)  According to Smitherman, SHA "directed [SHDC] to come up with the means to finance the building of them and promised us project-based Section 8's if we would build them," with the "them" referring to new low-income housing units.  (*Id.* at 67.)[45]  SHDC proceeded to construct the Woodrow projects, development of which was completed during the 1995-96 time frame.  (Smitherman Dep., at 78, 81.)[46]  Woodrow was fully occupied with both Section 8 and open market tenants immediately after construction was completed.  (*Id.* at 78.)

SHDC has never had any project-based Section 8 properties.  (SHDC Dep., at 85.)  During the 1995 time frame, SHDC never submitted an application for project-based Section 8 status and never received any indication from HUD that project-based vouchers would be issued for the Woodrow facilities.  (Smitherman Dep., at 74-75, 81.)  Significantly, Smitherman testified that by no later than 1997, SHDC knew that it was not receiving project-based Section 8 vouchers for Woodrow

---

[45]    The difference between "project-based Section 8" and the more standard tenant-based Section 8 system is that in the former case, the voucher (and, hence the Section 8 funding) stays with a particular unit, while in the latter the voucher stays with the individual, such that if the individual leaves, the Section 8 status of that unit disappears unless the landlord locates another Section 8 tenant.  (*Id.* at 67.)  As such, project-based Section 8 status is desirable for a property owner such as SHDC.

[46]    The Court assumes, as apparently do the parties, that the statement in the record that Woodrow's construction occurred in 1985 was either a misstatement or a typographical error, and that the proper year was 1995.  (Smitherman Dep., at 78.)

-37-

or Deer Ridge.  (*Id.* at 188.)[47]  Additionally, SHDC testified that by April 2001, SHDC realized that SHA "was not going to honor their agreement" by providing project-based Section 8 assistance for Woodrow and Deer Ridge.  (SHDC Dep., at 325.)[48]

On January 8, 2004, in response to a December 2003 written inquiry from SHDC, HUD notified SHDC that regulations in effect in 1993 required HUD to approve a public housing agency's implementation of a project-based Section 8 program, but that HUD had never received any request from SHA for such approval in 1993.  (Plaintiff's Exh. B.)  The record is devoid of evidence or explanation as to why SHDC waited a decade before inquiring to HUD about the matter.  There is no evidence or argument that either (a) SHDC could not have investigated HUD's approval requirements for project-based Section 8 programs earlier, or (b) SHDC could not have received confirmation from HUD earlier that no request for approval of project-based assistance had been made by SHA in or

---

[47]     The crucial exchange from Smitherman's deposition transcript is as follows:

"Q:     And you knew that you were not getting [project-based Section 8 assistance], at least as late as 1995?

"A:     No. We did not know that until we had jumped into 1997.  I mean, I don't, you know --

"Q:     But by 1997, you knew that you were not getting project-based Section 8 vouchers for [Woodrow and Deer Ridge].

"A:     That's correct."

(Smitherman Dep., at 188.)

[48]     The relevant transcript passage reads as follows:

"Q:     And by, you said, April of 2001, you realized that there weren't going to be any project-based Section 8s for those two entities?

"A:     We realized the Housing Authority was not going to honor their agreement, correct."

(SHDC Dep., at 325.)  SHDC further testified that it had consulted with its counsel about the possibility of filing a lawsuit against SHA in November 2001.  (*Id.* at 325-26.)

-38-

around 1993.[49]

> **B.      Analysis.**

The sole asserted basis for Rule 56 relief claimed by SHA with respect to the fraud claim is that the cause of action is untimely.  Under Alabama law, fraud claims must generally be brought within two years.  *See Spain v. Brown & Williamson Tobacco Corp.*, 872 So.2d 101, 129 (Ala. 2003); *Potter v. First Real Estate Co.*, 844 So.2d 540, 545 (Ala. 2002) (explaining that fraud claims are subject to a two-year statute of limitations under Alabama law); Ala. Code § 6-2-38(l).  Notwithstanding this two-year limitations period, Alabama law also provides the following saving clause: "In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action."  Ala. Code § 6-2-3.  This "discovery rule" means that "the limitations period begins to run when the plaintiff was privy to facts which would provoke inquiry in the mind of a person of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud."  *Davant v. United Land Corp.*, 896 So.2d 475, 491 (Ala. 2004) (citations omitted); *see also Dickinson v. Land Developers Const. Co.*, 882 So.2d 291, 298 (Ala. 2003) ("a party will be deemed to have 'discovered' a fraud as a matter of law upon the first of either the actual discovery of the fraud or when the party becomes privy to facts that would provoke inquiry in a reasonable person that, if followed up, would lead to the discovery of the fraud").

Plaintiff's fraud cause of action rests exclusively on the allegation that in 1993 SHA

---

[49]      Although not relevant to the legal issues presented on summary judgment, the record includes evidence that SHA circulated a request for proposals for a development using project-based Section 8 assistance in March 2004.  (Plaintiff's Exh. C.)  The record further reflects that SHDC and an entity called Selma Community Housing Development Organization submitted applications, and that the latter applicant was selected.  (Moss Dep., at 89-90.)  SHDC was notified of its rejection via letter dated March 23, 2004.  (Plaintiff's Exh. D.)  Plaintiff has not filed any claims in this lawsuit contesting SHA's decision in this regard, although they have inserted into the record various documents relating to those events and have discussed same in relation to their fraud claim.  To be clear, the fraud claim interposed in Count V relates exclusively to the alleged 1993 misrepresentation.  Plaintiff has not alleged any fraud in connection with the March 2004 bids for project-based Section 8 assistance, and there is no discernable link between the 1993 agreement and the 2004 bidding process.

misrepresented to SHDC that project-based Section 8 assistance would be provided if SHDC constructed more low-income housing units.  Construed in the light most favorable to plaintiff, the record reflects that such representations were made in 1993 and that no project-based Section 8 assistance was ever provided to SHDC; however, SHDC refrained from filing suit asserting this fraud claim against SHA until June 2004, some 11 years after the alleged misrepresentation.  The claim is plainly time-barred unless it is saved by the two-year discovery rule.

The undisputed facts are that (a) from the very outset of the Woodrow development in 1995, SHDC was not receiving project-based Section 8 assistance; (b) SHDC was never told that it had been awarded project-based Section 8 status; (c) by no later than 1997 SHDC knew that it was not receiving project-based assistance for the subject properties; (d) by no later than April 2001 SHDC knew that no project-based Section 8 assistance was forthcoming for those properties; and (e) despite these facts and despite its constant contact with HUD during the late 1990s and early 2000s, SHDC never inquired of HUD about the status of any project-based Section 8 assistance requests for the subject properties until December 2003, more than a decade after the alleged misrepresentation.

Given these undisputed facts, a persuasive argument could be made that SHDC was on notice of the alleged fraud for purposes of Alabama's discovery rule back in 1997, when it first knew that it was not receiving project-based Section 8 assistance despite the new properties having been in operation for one to two years.  Although a reasonably prudent person almost certainly would have done so, SHDC conducted no inquiry and engaged in no follow-up at that time, despite having good reason to believe that SHA was not honoring its alleged promise to provide project-based Section 8 assistance.  But SHA's limitations argument need not be resolved on this basis.  Rather, SHA takes its position one step further via plaintiff's admission of actual knowledge in April 2001 that SHA was never going to provide project-based Section 8 assistance to Woodrow or Deer Ridge.  By that time, SHDC had been operating those facilities for five to six years without receiving project-based Section 8 assistance.  In the face of this unequivocal evidence, it boggles the mind that SHDC might maintain that it had not yet discovered the fraud by that time.  Yet there again, SHDC neglected to follow up with SHA or HUD for more than two years, or to file suit for more than three years.

-40-

In light of these facts, the Court finds as a matter of law that SHDC must be deemed to have discovered the fraud by no later than April 2001.  Plaintiff's fraud cause of action was therefore brought well outside the applicable statute of limitations.[50]  Accordingly, defendant's Motion for Summary Judgment is **granted** with respect to Count V.

## VII.    Conclusion.

For all of the foregoing reasons, the Court finds that there are no genuine issues of material fact and that defendant is entitled to entry of judgment in its favor as a matter of law.  As such, the Motion for Summary Judgment (doc. 34) is **granted**, and plaintiff's claims are **dismissed with prejudice**.


DONE and ORDERED this 16th day of August, 2005.


s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[50]    Plaintiff argues to the contrary that the discovery date should be deemed January 2004 because it was only then that SHDC learned that SHA had never requested project-based assistance for SHDC.  (Opposition Brief, at 22.)  This contention misapplies Alabama's discovery rule.  A plaintiff cannot simply watch an alleged fraud unfold, then sit patiently for several years until it is ready to file suit, and then begin an investigation to verify its existing knowledge of the fraudulent act.  In April 2001, plaintiff knew that SHA had failed to provide the project-based assistance it had promised some 8 years earlier.  Even if that knowledge did not constitute "discovery" under Alabama law, it surely imposed on SHDC an obligation to follow up with SHA or HUD at that time, but SHDC waited 32 more months before doing so.  In the absence of any colorable explanation for why SHDC tarried in writing its letter of inquiry to HUD until December 2003, despite the wealth of knowledge it undisputedly possessed years earlier that tended to show fraudulent representations by SHA in 1993, the Court cannot agree that the discovery rule was first triggered in 2004.  Finally, to the extent that plaintiff attempts to bootstrap a timeliness argument on the March 2004 request for proposals, the Court perceives no factual link between the March 2004 events and the subject matter of Count V.  Plaintiff does not now allege and has never alleged that SHA engaged in fraudulent practices in denying SHDC's bid for the new project-based assistance project in 2004, nor has it shown how those events were in any way illuminating to it as to the fraudulent nature of SHA's representations in 1993 relating to completely different properties.